**Sally BENNETT, Administratrix of the Estate of David Bennett, Plaintiff,**

v.

**Francis F. MURPHY, individually and in his capacity as Pennsylvania State Trooper, Defendant.**

**Civil Action No. 94–214.**

United States District Court,
W.D. Pennsylvania.

Aug. 10, 2000.

Victor H. Pribanic, Vincent A. Coppola, Pribanic & Pribanic, White Oak, for Plaintiff.

Kemal A. Mericli, Office of the Attorney General, Pittsburgh, for Defendant.

## MEMORANDUM OPINION

CINDRICH, District Judge.

By memorandum order dated January 7, 2000, the court granted plaintiff's ("Bennett") motion for new trial. Defendant ("Murphy") thereupon sought reconsideration, and moved separately for summary judgment. In these submissions Murphy

formally raises an issue that the court informally and unfavorably addressed in the January 7, 2000 decision, namely qualified immunity. Because of the right Murphy asserts, he is entitled to a decision directly addressing the matter. *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759, 779 n. 19 (1998) (immediate interlocutory appeal available for denial of immunity).

### A. *Murphy's Invocation of Qualified Immunity*

As is well established, qualified immunity is a doctrine that insulates the holder from trial, not just from liability. Since the court granted Bennett's motion for new trial, Murphy seeks protection from the consequences of that decision.

At the outset, we repeat that there is no basis on which to find a waiver of qualified immunity. The new trial Murphy faces, with new burdens and potential for liability, is precisely the sort of ordeal that qualified immunity covers. Unless Bennett can show some current knowing and voluntary waiver of the right to qualified immunity, which she has not done, we believe Murphy would have that right any time he faced a lawsuit based on his conduct as a law enforcement officer. The decision that Murphy should face trial again thus properly triggered his invocation of that right.

### B. *Was the Use of Deadly Force Indisputably Reasonable as a Matter of Law?*

Murphy's argument on the merits of his defense is straightforward. He casts the facts in a way he claims is most favorable to Bennett, using testimony from Bennett's own witnesses. He then mines precedent for examples of what he calls "high-ly comparable cases" of the use of deadly force where the court approved the defense of qualified immunity, and ended the case. *See, e.g., Montoute v. Carr*, 114 F.3d 181 (11th Cir.1997); *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691 (1st Cir. 1994); *Medeiros v. Town of Dracut*, 21 F.Supp.2d 82 (D.Mass.1998).[1] He concludes that under these circumstances, "[i]t cannot be said that no reasonably competent police officer would have shot David Bennett under the facts as Mrs. Bennett has presented them at the first trial." Motion for Summary Judgment on Grounds of Qualified Immunity as a Matter of Law, Doc. No. 118 at 4. Since a reasonable police officer would have shot David Bennett, Murphy claims that he is immune.

We make three findings that conclusively disfavor his position. The first is that we disagree that Murphy has cast the facts in the light most favorable to Bennett. In our view, the most favorable facts, ignoring evidentiary disputes, can be summarized as follows. The state police were called to the courtyard of a group of apartment buildings on the evening of January 4, 1994 to confront a man, David Bennett, who they soon learned was distraught at being unable to see his girlfriend. He was armed with a single shot shotgun that he held vertically in front of him, with the barrel pointed up at his head, and the stock facing down. He was "very deliberate in holding [the gun] toward himself or in the air," and did not point the gun at anyone, including state troopers. Doc. No. 122, Simmers Testimony, Transcript at 141–42. He said that he wanted to kill himself. *Id.* at 203, Darlene Chump Testimony. As the troopers took up positions surrounding him in the open area between the apartment buildings, he became agitat-

---

1. In *Montoute*, the plaintiff approached police during a street disturbance with a sawed-off shotgun. He ignored orders to drop the weapon, but never pointed it at anyone. He was shot only after passing police and moving away from them. In *Roy*, a drunk plaintiff armed with two steak knives was shot by police who had room to retreat, and who might have better handled the situation with chemical mace. In *Medeiros*, the unarmed but nervous companion of a man who drew a gun and pointed it at police was shot twice after he dove behind the door of his truck.

ed and began moving toward a group of them, but stopped for perhaps four seconds before he was shot. *Id.* at 277, Ciciretti Testimony. Murphy was positioned 80 yards behind Bennett when he fired. Almost an hour passed between the time the state troopers first arrived on the scene, and the time Bennett was shot.

Bennett admittedly was angry and defiant in the face of a group of determined, armed state troopers. But to take the version of the facts most favorable to Bennett, is it indisputably reasonable as a matter of law for a law enforcement officer 80 yards away; at night; under conditions of poor visibility; to shoot someone who is standing still; facing away; with a gun pointed at his own head, threatening suicide; surrounded by heavily armed fellow officers in close proximity; out of fear of a threat to other troopers positioned at one third the distance; who were in a much better position to see the decedent; and who did not shoot; after almost an hour had passed with no offensive action by the state police? This court's answer is no; first, because there is no definitive standard of reasonableness against which to measure the officer's conduct; second, because that measurement should be more properly in the hands of a jury; and last, because there are disputed issues of material facts.

The second factor is the position of the United States Court of Appeals for the Third Circuit, which recently and closely examined a case involving the use of deadly force. The court of appeals reversed the same type of finding of objective reasonableness that Murphy asks us to make here. Because of its applicability, the decision is worth quoting at length.

> Combining the standards announced in *Garner* and *Graham,* our inquiry for the use of deadly force is as follows: Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others? In determining the reasonableness of all degrees of force, the Supreme Court has said that the factors to consider include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. at 396, 109 S.Ct. at 1872.
>
> Because we are applying this standard on a summary judgment motion, we must address to what extent questions of "reasonableness" can be resolved on summary judgment. Reasonableness under the Fourth Amendment resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment. This sensitivity to context suggests that regardless of whether objective reasonableness invokes a different and heightened standard from negligence, *reasonableness under the Fourth Amendment should frequently remain a question for the jury.* To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

*Abraham v. Raso,* 183 F.3d 279, 289–90 (3d Cir.1999) (emphasis added). The court of appeals went on to find it appropriate to examine the "totality of the circumstances" in deadly force cases. " 'Totality' is an encompassing word. It implies that reasonableness should be sensitive to all of the factors bearing on the officer's use of force." *Id.* at 291. In a similar vein, the court approvingly cited Ninth Circuit precedent about caution in considering testimony on summary judgment about which credibility judgments must be made.

The court may not simply accept what may be a selfserving account by the officer. It must also look at circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably.

*Id.* at 294 (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994)). As we found in our January 2000 decision, there is considerable evidence on which to question Murphy's credibility, and which might have led to other admissible evidence. All of these conclusions counsel against finding that Murphy's actions were reasonable as a matter of law on summary judgment, regardless of the number and strength of opinions coming from other courts of appeal.

Third, one of the angles from which Murphy approaches this problem is by an argument that his testimony is superfluous. He states,

if Mr. Bennett's actions, as described by his own witnesses exclusively, provide sufficient grounds for qualified immunity it doesn't matter what Murphy saw, who Murphy is, what makes him tick or whether he tells the truth. The police shooter could be anybody and there is not liability.

Motion for Reconsideration, Doc. No. 114, at 4. We think this position is incorrect. The Supreme Court in *Graham v. Connor* stated that

[t]he "reasonableness" of a particular use of force must be judged *from the perspective of a reasonable officer on the scene,* rather than with the $^{20}\!/_{20}$ vision of hindsight. . . .

the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances *confronting them,* without regard to their underlying intent or motivations.

490 U.S. at 396–97, 109 S.Ct. 1865 (emphasis added); *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997) ("Supreme Court

has emphasized that the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law *and the information in the officer's possession* ") (emphasis added). Thus, the information available to Murphy himself is critical to the determination of reasonableness. The seeming advantage that Murphy affords Bennett by using the testimony of plaintiffs' witnesses thus is not an advantage; it does not meet the ultimate legal test, which employs a totality of the circumstances as seen and heard by a reasonable officer *in Murphy's position,* and not elsewhere on the night in question. In this case, it is *only* from the mind and mouth of Murphy that we can supply the crucial "facts and circumstances confronting" our hypothetical, objectively reasonable officer. It is only from the testimony of Murphy that we can gather the information which he maintains creates the justification for the use of deadly force—i.e., the belief that existed in his own mind that his fellow officers were in imminent danger of death or serious bodily injury at the hands of Bennett.

Other evidence besides Murphy's testimony is relevant, however, because of the need for the factfinder to take in the totality of the circumstances. This is only appropriate. For example, assume the same circumstances as the night Bennett was killed, except that Bennett had announced his intention to surrender. Every trooper heard and believed this statement except Murphy, because of his position. Murphy's killing of Bennett might still be immunized because he mistakenly, though reasonably, interpreted Bennett's actions in advancing toward fellow troopers as a deadly threat rather than a surrender. *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (qualified immunity gives ample room for mistaken judgments). If Murphy was in front of Bennett, however, heard his statement of surrender, and still fired, his justification might be seen as unreasonable. The difference is the information available to the

trooper who pulled the trigger, which must be weighed against how a reasonable officer in that position would have processed and acted upon that information.

We therefore find that Murphy's testimony is critical to a determination of liability in this particular case, and that his credibility is very much a related issue, as we found in our January 2000 opinion granting a new trial. Indeed, another potentially important issue of credibility arises in the failure of any state police witness to identify the voice that said "Do it now Murph" over the police radio eight minutes before Bennett was shot. Doc. No. 122, Gregoritch Testimony at 192–93. In making its determination as to exactly what were the totality of the facts and circumstances known to the officer who fired the deadly shot, the jury must hear and weigh the credibility of the testimony presented by all witnesses, including fellow police officers.

This court knows from a variety of sources something about the lot of law enforcement officers. They have been my colleagues in law enforcement. When I was a member of the Office of the District Attorney, they were our most frequent and crucial witnesses in nearly every one of the hundreds of cases I prosecuted. I have instructed them at the police academy. In private practice I represented them. I hear them testify under oath. I read cases about their conduct. I am familiar with credible news accounts of their activities. I know they are shot, stabbed, punched, bitten, dragged by cars, and assaulted with blunt objects. I am more than willing to grant them the atmosphere of tension and violence, and the need to make split second decisions because of what I know from experience, even without the command of the appellate courts. Where deadly force is concerned, however, the question is whether, in this circuit, on summary judgment, the decision about reasonableness is made by a judge, who is seldom in a position to reliably assess the totality of the circumstances, or by a jury.

We need no proof to understand how the world is often callous and cruel, and that the job of law enforcement officers regularly forces them to deal with the worst human behavior. But these observations can obscure what we think should be the starting point for examining episodes like this one. At some place in our analysis it is worth recalling that preservation of life is our highest moral purpose and that moral purpose is actualized in the Constitution and the law. The taking of life by those we assign to protect us therefore must embody the utmost restraint. This is not sentimental sermon, but rather is the command of law, which recognizes the value of human life, and permits deadly force—the potential taking of life—to be used only in narrow circumstances.[2] Moreover, even these narrow circumstances further vindi-

---

2. Controlling Pennsylvania law states:

(a) Peace officer's use of force in making arrest.—

(1) A peace officer . . . need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

(i) such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii) the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

18 Pa. Cons.Stat. Ann. § 508. Pennsylvania State Police regulations on deadly force admitted at trial state further that, before resorting to deadly force, troopers "shall exhaust every other reasonable means" of apprehension or defense. Plaintiff's Exhibit 102, Pennsylvania State Police Department Directive 3.01.

cate, and not lessen, the respect we demand for human life, since they in essence say that the taking of life by law enforcement is permitted only to the extent that other lives are seriously and immediately endangered.

We make this observation because of the decisions of some other courts of appeals cited by Murphy, and because of his own position on qualified immunity. We hesitate to characterize it, for to do so incorrectly would diminish the force of what we think is the proper ruling. But we take his position to be the following: a person holding a dangerous weapon is subject to being killed by law enforcement officers when that person does not immediately respond to a command to drop the weapon, and further, that the officer is automatically relieved by qualified immunity from being called to account for that action before a jury of his peers.

Murphy's position stated as such would tend to create problems for two groups that quickly come to mind. The first is off-duty law enforcement officers. Many of them are required or choose to carry guns while off-duty. If an unknown off-duty officer responded to a situation where drawing his gun was necessary, and did not immediately comply with a uniformed officer's command to drop his weapon, it would seem that his life would be in danger. After all, the same justification that applied to Bennett—that the weapon could be turned against police instantly and without warning—would apply to that situation as well.

The second group is the large number of our law abiding citizens who steadfastly support and exercise their constitutional right to bear arms, prominently and creatively. In what ways would the presence of their weapons place their safety at risk unless law enforcement used the maximum restraint before considering the presence of a gun, without more, as a situation which the law recognizes as justifying the use of deadly force?

Murphy's current position directly implicates how such cases will be handled by the courts in this circuit. For it is not the standard to be applied in excessive force cases in which he stakes out, in our view, his most extreme position, but rather who should apply the standard. He contends that even in cases where facts of the key events are in dispute, and the credibility of the defendant officer is very much in question, where the decedent possessed a weapon, the reasonableness of the trooper's actions should be decided in all cases by the court.

The court disagrees. As demonstrated above, excessive force cases are typically riven with factual disputes about key events. Even where they are not, the decisive question is one of the reasonableness of the officer's conduct in light of all the circumstances. As the court in *Abraham* found, this is a quintessential jury question.

We acknowledge that a tradeoff of sorts is inherent in the *Abraham* ruling and ours as well. If these matters are left to the jury, the consequence is the loss of the officer's chance of being released from any obligation to face a trial. The court is acutely aware of the dangers confronting law officers and the need for rules of law which give them appropriate leeway to perform their duties and protection from unwarranted prosecution, civil or criminal. However, we believe that the Supreme Court and the Court of Appeals for the Third Circuit have carefully crafted a set of rules which provides an appropriate measure of protection to police officers. These include the following well-known principles with respect to the use of force:

1. In making a lawful arrest, a law enforcement officer has the right to use such force as is necessary under the circumstances to make the arrest.

2. The Fourth Amendment does not require law enforcement officers to use less harmful alternatives to deadly force if such force is otherwise justified. The

only question is whether the actions taken by the officer were reasonable.

3. The test of reasonableness in the use of deadly force is an objective one.

4. The question is whether the officer's actions were "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.

5. Since this is an objective test, the defendant's intent, motivation, or any other aspects of the defendant's individual state of mind have no place in the inquiry.

6. A police officer's evil intentions will not make a constitutional violation out of an objectively reasonable use of force; by the same token, an officer's good intentions will not make an objectively unreasonable use of force, constitutional.

7. While the test of reasonableness is not capable of precise definition, its application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight.

8. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}/_{20}$ vision of hindsight.

9. Reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments about the amount of force that is necessary in a particular situation.

Thus, even where the officer must stand trial, he still benefits from the favorable law precluding consideration of intent or motive, use of hindsight in judging tense, unpredictable situations, and allowance for mistaken judgments, which is given as part of the jury charge.

If the court routinely decided reasonableness in excessive force cases, as Murphy has suggested, the officer's use of force would not only be largely unexamined, since summary judgment never presents the totality of circumstances the way a trial would, but we would lose the community's judgment on the reasonableness of the force, which is much more validly produced by the collective wisdom of the jury. This is especially so in cases where the need for the utmost restraint is in issue. We believe that the prospect of facing a jury would encourage the restraint that the law on use of force embodies. There is much to be gained from this type of inquiry.

Arriving at this conclusion has raised other intriguing issues. For example, in employment discrimination cases, summary judgment can be denied and the case borne over for trial on the thinnest of evidence—evidence which relates not to the ultimate question in the case (Did defendant discriminate because of an illegal reason?), but rather to some flaw in one portion of the opposing party's proof (Has the plaintiff discredited the defendant's proffered reasons?). One apparent justification for this rule is that district courts must not succumb to " 'excessive mistrust of juries.' " *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987)). Accordingly, we should deliver all but the patently frivolous employment cases to the jury. Where citizens' constitutional rights are at issue, on the other hand, it is suggested that we not let juries "second guess" the acts of police. *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994) ("in close cases, a jury does not automatically get to second-guess these life and death decisions"). Is it not curious how trial courts are urged to show little tolerance for errors, inconsistencies, and implausibilities in deciding questions in employment cases, where someone loses a job or a promotion, and how broad a tolerance for errors is required in excessive force cases, where life and limb may be at stake? And

do we trust juries to correctly decide close questions, or not? After all, the jury is the same body, regardless of what type of case it hears. Moreover, there is irony in these appellate courts' observations about how district judges regard juries and how juries perform their duties, since they are far removed from the jury process and any contact with jurors.

## C. Procedural Issues in Deciding Qualified Immunity

### 1. Respective Roles of Judge and Jury

Information previously provided by counsel suggests that this case is a likely candidate for immediate appellate review. If so, it would be a great benefit to the trial court if the court of appeals would consider several issues that directly affect our qualified immunity procedure in this case and many others.

The court of appeals stated as follows in *Sharrar v. Felsing:*

We thus hold, following the Supreme Court's decision in *Hunter*, that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of "clearly established

law" that is for the court but also whether the actions of the officers were objectively reasonable. Only if the historical facts material to the latter issue are in dispute, as in *Karnes [v. Skrutski*, 62 F.3d 485(3rd Cir.1995)]*, will there be an issue for the jury. The reasonableness of the officers' beliefs or actions is not a jury question, as the Supreme Court explained in *Hunter.*

128 F.3d at 828. With this holding, the court unmistakably stated its conclusions regarding "the issue relevant [t]here, the respective roles of the judge and the jury," *id.,* in deciding qualified immunity.

Although a welcomed elucidation of the role of court and jury at the time it was decided, this court, at least, has found the principles enunciated in *Sharrar* to be very difficult to apply, at least as to cases involving allegations of excessive force. *Sharrar* conclusively assigns the role of deciding qualified immunity to the court, except in cases where the historical facts are in dispute. The majority of our section 1983 cases, however, and usually the most difficult ones, are excessive force cases, where the historical facts are often sharply in dispute.[3] *Sharrar* did not sug-

---

**3.** Here are the paraphrased, summarized positions of the parties in a sample of some section 1983 cases we have heard.

1. Plaintiff: When the officer came for me I expressed displeasure at not being able to take my personal belongings. He punched me so hard in the face that he blinded me in one eye.
   Defendant: He grabbed for my gun, so I acted to prevent that danger.
2. Plaintiff: The officer twisted my arm behind my back so hard that my arm broke.
   Defendant: I never touched him.
3. Plaintiff: The corrections officer slapped me hard in the face for no reason.
   Defendant: The prisoner would not respond to my directions so I prodded him to move along.
4. Plaintiff: The officer put me in a full nelson and threw me up the steps of the police station.
   Defendant: I grabbed plaintiff's upper arm when he became belligerent and escorted him into the station.

5. Plaintiff: The mentally ill decedent was shot and killed because he would not submit to the police.
   Defendant: I shot decedent when he opened a door with an upraised knife within a few feet of a fellow officer.
6. Plaintiff: The officers beat me up when I talked back to them.
   Defendant: Plaintiff was drunk and attacked us when we questioned him.
7. Plaintiff: After arresting a drunk pedestrian, the officers handcuffed him and lay him face down in the middle of the road where he was run over and dragged to death.
   Defendants: Decedent was placed on the side of the road.
8. Plaintiff: The officers threw me down the steps.
   Defendants: Plaintiff was kicking and spitting on us and fell down the steps.
9. Plaintiff: I saw the roadblock, turned around, and drove away quickly because I was late for work. When the police stopped me one of them pointed a gun at my head.

gest the procedure by which a trial court decides whether an officer's actions are reasonable, but the jury decides the historical facts. We considered a phased trial in which the dispute of historical facts would be submitted to the jury as interrogatories. The court would then take the answers to the interrogatories and use them to decide the legal question of reasonableness.

This did not seem satisfactory for at least two reasons. First, it did not do much to preserve the advantages of qualified immunity, since it would require all pretrial preparation and a trial to arrive at the answer of whether the defendant can successfully invoke a doctrine intended to spare him from just those ordeals. But the more confounding result is that a jury which has decided the historical facts has for all intents and purposes decided the question of qualified immunity. For example, in determining that an arrestee's alleged struggling produced his injuries, rather than an officer's alleged brutal handling, the jury would be finding in essence that the officer's actions were reasonable, rather than excessive. Thus, the legal question assigned as the court's responsibility would be little more than a formality. Though we cannot assume this is what the court in *Sharrar* had in mind, it was in any event difficult to fit our duty to decide reasonableness as a matter of law into the customary trial procedures we used for the typical section 1983 case.

*Sharrar* arrived at its holding by following the previously uncited case of *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam). 128 F.3d at 827 (*Hunter* "surprisingly appears not to have been cited in any of this court's reported opinions" ... "we have not always followed what appears to be the Supreme Court's instruction" from *Hunter*). The key quotation from *Hunter* states:

> First, [the error of the Ninth Circuit] routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. *See Mitchell, supra,* at 527–529, 105 S.Ct. 2806. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

502 U.S. at 228, 112 S.Ct. 534. One might argue that the Supreme Court's statement is concerned with the timing of the qualified immunity determination (though the two matters—who makes the qualified immunity decision and when it gets made—are directly linked). The Court follows its first point by emphasizing the immunity should be decided "long before trial." Of course the judge is the only decisionmaker who could exercise any powers before trial, but the Court's point may be to emphasize the insulation from suit that is the purpose of immunity, rather than fixing the assignment of this task to judges, as *Sharrar* holds.

In any event, *Hunter* was a case where the court found the facts undisputed. 502 U.S. at 228, 112 S.Ct. 534. *Hunter*'s only citation in the key passage quoted in *Sharrar* is *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The facts in *Mitchell* likewise were found to be undisputed, 472 U.S. at 515, 105 S.Ct. 2806, involving the legality of the attorney

Defendant: Plaintiff turned around and sped away suspiciously after seeing the roadblock. The gun was at my side, not pointed at plaintiff.

10. Plaintiff: Decedent drove past and then returned to an accident scene because he thought he knew someone involved. The officer lunged through the window of the truck and then shot and killed decedent.

Defendant: Decedent refused to pull over when I attempted to question him about speeding by the scene. When I reached in to remove the keys, he drove off, attempting to drag me into a street sign.

11. Plaintiff: Unarmed decedent was shot and killed within several feet of the officer when decedent was running toward the officer. Defendant: The gun went off when decedent brushed against it as he was running past.

general's authorization of a warrantless wiretap. Nor were there fact issues in the other Third Circuit cases cited in *Sharrar* as instances when the court of appeals recognized that the question of immunity was exclusively a legal question for the court. 128 F.3d at 827–28 (citing *Parkhurst v. Trapp,* 77 F.3d 707 (3d Cir.1996); *Rogers v. Powell,* 120 F.3d 446 (3d Cir. 1997); and *Capone v. Marinelli,* 868 F.2d 102 (3d Cir.1989)). Certainly the court of appeals in *Sharrar* recognized an exception to its holding where there are historical facts in dispute. 128 F.3d at 828. But given that finding, the number of cases involving strong factual disputes, and the precedent which the court called forth, a line as sharp as the one drawn is *Sharrar* does not seem necessary or supported.

The Commonwealth's urging of a qualified immunity finding in this deadly force case brought this issue to head, and also compelled us to look at *Abraham.* As cited above, while *Sharrar* says that "[t]he reasonableness of the officers' beliefs or actions is not a jury question," 128 F.3d at 828, *Abraham* says that "reasonableness under the Fourth Amendment should frequently remain a question for the jury," 183 F.3d at 290. *Abraham* does not cite *Sharrar.* Our attempt to reconcile the two cases as required by this case has led us to follow *Abraham,* because of the practical difficulties in applying *Sharrar* noted above, and because we believe *Abraham* makes a considerably more convincing case for the respective roles of the judge and jury in excessive force cases.

2. *The Facts Used in Deciding Qualified Immunity*

*Abraham* raises another issue that could affect how we approach the task of deciding a motion for summary judgment based on qualified immunity. The court of appeals there performed the standard Rule 56 exercise of looking for genuine disputes of material fact, and found such disputes which precluded summary judgment. 183 F.3d at 290. In pointing out other errors

of the district court, the court of appeals said that the district court "did not read the evidence in the light most favorable to the estate and failed to rely on the estate's version of events where there were genuine factual disputes." *Id.* at 292. The court expressly agreed with a Ninth Circuit decision that suggested the same procedure. *Id.* at 290.

Considering evidence on summary judgment in the light most favorable to the non-moving party is a familiar process for the court. It would manifest itself in a conclusion, for example, that if there was testimony that a car was moving 25 or 30 miles per hour, and the non-moving party's case would benefit by using the 30 mph figure rather than the 25 mph figure, we would use 30 mph in deciding summary judgment.

This question seems more pointed in a qualified immunity context in light of the Supreme Court's recitation in *Mitchell v. Forsyth* of how to consider the facts in deciding a qualified immunity question, which does not include this procedure. The Supreme Court stated that:

An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took. [FN9] To be sure, the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief; the same is true, however, when a court must consider whether a prosecution is

barred by a claim of former jeopardy or whether a Congressman is absolutely immune from suit because the complained of conduct falls within the protections of the Speech and Debate Clause.

*Mitchell,* 472 U.S. at 528, 105 S.Ct. 2806.

The footnote accompanying this quotation states: "We emphasize at this point that the appealable issue is purely a legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Id.* Where factfinding in support of a qualified immunity decision in an excessive force claim is concerned, it is difficult to analogize those cases involving double jeopardy or the speech and debate clause. In the former, the facts merely form the framework for the decision of whether the conduct at issue falls within the rule. In the latter, the facts themselves drive the determination of whether the conduct is within the rule or not.

A speech on the floor of the Senate, whether a good one or a bad one, is within the protection of the Speech and Debate Clause. To apply this rule of law, the only facts the court need ascertain do not pertain to the nature or quality of the conduct (speech) itself or the circumstances surrounding it. Determining whether qualified immunity applies when there is a claim of excessive force, however, requires a determination of just what conduct in fact occurred, as well as the circumstances surrounding the conduct. Resolution of the claim also requires a determination of whether, given those peculiar facts and circumstances found to have existed, the conduct was "reasonable" (immune) or excessive (not immune).

Thus, we return to the question of who—the judge or the jury—has the responsibility to determine what happened, the circumstances under which it happened and the reasonableness of the conduct at issue. This is a rather lengthy way of making the point that, at least in cases involving a claim of the use of excessive force, Judge Cowan got it right. The jury, not the judge is the decisionmaker best suited to hear and decide conflicting testimony both as to what happened and as to what circumstances surrounded or prompted the happening. Moreover, putting aside claims of police conduct patently too trivial to be considered excessive and thus susceptible to a judicial determination, we believe that it is the jury which is in the best position to determine whether this conduct was "reasonable" under the circumstances. That is both because there is no clearly defined standard of reasonableness for the court to apply and because such a standard should emerge from the conscience of the community, not the mind of a single judge.

## D. *Conclusion*

Murphy is not entitled to qualified immunity on summary judgment because of disputes of fact and issues of credibility that should be submitted to a jury, as we previously found in our January 2000 decision. In addition to the questions on the merits that this decision presents for appeal, we raise the following other questions that are relevant to the determination of this motion.

1. Acknowledging that *Sharrar* recognized an exception for cases with disputes of historical facts, is there a conflict between *Sharrar* and *Abraham* about the respective roles of judge and jury in deciding qualified immunity as applied to claims of excessive force?

2. Where historical facts or questions of credibility are in dispute and require jury resolution, is *the court* still obligated to make a final and formal determination of the reasonableness of the officer's actions and the issue of qualified immunity, and if so, by what procedure is this best accomplished?