**Patricia Anne LEONG, as personal representative of the Estate of Hong Junior Leong, Plaintiff,**

v.

**CITY OF DETROIT, John Borgens, and James Pratt, Defendants.**

No. 99–76051.

United States District Court,
E.D. Michigan,
Southern Division.

July 6, 2001.

David A. Robinson (P37000), Southfield, MI, for plaintiff.

Jacob Schwarzberg (P37693), John A. Schapka (P36731), Detroit, MI, for defendants.

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Patricia Anne Leong, the personal representative of the Estate of Hong Junior Leong, commenced this suit on November 18, 1999 in Wayne County Circuit Court, State of Michigan. In her complaint, Plaintiff alleges that Defendants John Borgens and James Pratt, two police officers for the Defendant City of Detroit, violated Mr. Leong's rights under the state and federal constitutions when they shot and killed him on November 18, 1997 after stopping his pickup truck for a traffic violation. On December 17, 1999, Defendants removed the case to this Court, citing Plaintiff's assertion of federal claims under 42 U.S.C. § 1983.

On December 22, 2000, Defendants filed the present motion for summary judgment. In support of this motion, Defendants argue (i) that officers Borgens and Pratt are shielded from liability for Plaintiff's federal constitutional claims under the doctrine of qualified immunity; (ii) that Plaintiff has failed to identify a custom or policy of the Defendant City of Detroit that was the moving force behind any alleged violation of Mr. Leong's constitutional rights; (iii) that Plaintiff has failed to state a claim for relief under the Michigan Constitution; and (iv) that the Michigan doctrine of governmental immunity precludes any state-law tort claims that Plaintiff might be asserting. Plaintiff filed a response in opposition to this motion on January 19, 2001, and Defendants filed a reply brief in further support of their motion on January 26, 2001.

On April 19, 2001, this Court held a hearing on Defendants' motion. Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and the other materials in the record, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

### II. FACTUAL BACKGROUND

This case arises from the fatal shooting of Hong Junior Leong by the Defendant Detroit police officers, John Borgens and James Pratt, on the evening of November 18, 1997. At around 8:30 p.m. on the night in question, Mr. Leong was driving a red Chevrolet pickup truck in the City of Detroit, when he pulled up immediately behind a vehicle occupied by two young women. The driver, Sara Callison, later reported that the driver of the pickup truck pointed a shotgun out the window of his vehicle and fired two shots toward her car. Ms. Callison then turned and drove toward a friend's house, while the pickup truck continued straight down the street.

Immediately following this incident, Mr. Leong's truck approached an intersection where the Defendant police officers, John Borgens and James Pratt, were on routine patrol in a marked scout car. As the pickup truck proceeded through this intersection, Mr. Leong squealed his tires and turned the corner at a high rate of speed.

The officers observed this, and shone their car's spotlight on Mr. Leong's vehicle. However, when Mr. Leong refused to stop and pull over, the officers activated the scout car's siren, emergency lights, and flashers, and began to pursue the pickup truck. The officers' actions were motivated solely by their observation of Mr. Leong's traffic infraction; they were not yet aware of the earlier shooting incident.

In the ensuing chase, Mr. Leong led the officers down several streets and alleys. He ultimately turned his truck down a dead end street, where his path was blocked by a school. The officers pulled their scout car to within a foot of Mr. Leong's rear bumper, so that the pickup truck was blocked at both the front and the rear.

As the officers were about to exit their vehicle, they heard a loud blast and observed a muzzle flash from the direction of Mr. Leong's vehicle, and, at almost this precise moment, they saw Mr. Leong open the door of his pickup truck and begin to emerge from the vehicle. The officers concluded that Mr. Leong had fired a shotgun, although they were unsure whether the blast came from within or from outside of the pickup truck.[1] Based on the location of the muzzle flash, near the top of Mr. Leong's vehicle, the officers did not believe that Mr. Leong had fired his weapon directly at them.

The officers then exited their scout car, as Mr. Leong also emerged from his truck. The officers observed that Mr. Leong was holding a shotgun, and they took up positions adjacent to the doors of the police vehicle, with Officer Borgens on the driver's side and Officer Pratt on the passenger's side. According to the officers' deposition testimony, Mr. Leong proceeded to step away from his truck and move toward Officer Borgens' position, with the shotgun barrel initially pointed up in the air. (See Defendants' Motion, Ex. 2, Borgens Dep. at 29–32; Ex. 3, Pratt Dep. at 44–49.) The officers yelled repeatedly for Mr. Leong to drop his gun, to which he purportedly responded, "Just shoot me," or "Go ahead and shoot me." (Borgens Dep. at 122–23; Pratt Dep. at 52, 58–59.)

The officers have testified that Mr. Leong "racked" his shotgun—that is, loaded a new shell into the barrel, causing the empty shell to be ejected from the gun [2]— and that he then leveled this weapon and pointed it back and forth between Officers Borgens and Pratt. (See Borgens Dep. at 35; Pratt Dep. at 50–53, 59.) When Officer Pratt perceived that Mr. Leong had leveled his shotgun at his partner, he began firing at Mr. Leong and stopped when Mr. Leong began falling to the ground. (See Pratt Dep. at 59–62.) Officer Pratt testified that, as he fired, he could see only Mr. Leong's back, the back of his head, and his left arm. (See id. at 64.) For his part, Officer Borgens testified that he began shooting after Mr. Leong leveled his shotgun "in my direction," with the "barrel pointed towards me," and that he ceased firing when he saw Mr. Leong fall to the ground. (Borgens Dep. at 35, 120.) Officer Borgens further stated that, as he began shooting, Mr. Leong's body was not squarely facing him, but instead was "bladed," with his left shoulder pointed toward the officer. (Id. at 45.)

---

1. Subsequent investigation revealed that Mr. Leong had shot a hole in the roof of his truck as he exited the vehicle.

2. In his investigation of the scene of the shooting, Detroit Police Officer William Wylie reported finding a spent shotgun shell near Mr. Leong's body. (See Defendants' Motion, Ex. 8.) This report, then, tends to corroborate the officers' account that Mr. Leong racked his shotgun while standing outside his truck.

After the shooting, the officers approached Mr. Leong, handcuffed him, and kicked the shotgun away from his body. (Borgens Dep. at 60, 67–68; Pratt Dep. at 74.) Mr. Leong was taken to Detroit Receiving Hospital, where he was pronounced dead on arrival.

An autopsy report prepared by the Wayne County Medical Examiner stated that Mr. Leong was shot between 12 and 16 times, depending on possible re-entry wounds. (*See* Plaintiff's Response, Ex. 1 at 6.) The medical examiner identified 11 gunshot wounds to the trunk of Mr. Leong's body, all of which were "from back to front"—that is, the bullets entered through the back of the body. (*Id.* at 6.) In addition, the medical examiner observed a gunshot wound which entered through the back of Mr. Leong's left arm, and another which entered through the palm of his left hand. (*Id.* at 4.) The examiner found "no evidence of close range firing on the skin surrounding the exit wounds." (*Id.* at 6.) Laboratory results attached to the report showed that Mr. Leong had an alcohol level of 0.21 in his urine, and a blood-alcohol level of 0.13. (*Id.* at 10.) The report concluded by classifying the manner of death as a homicide. (*Id.* at 6.)

A Board of Review convened by the Detroit Police Department investigated the shooting, and issued a report on December 29, 1997 recommending that Officers Borgens and Pratt be "completely exonerated." (Plaintiff's Response, Ex. 5 at 8.) While expressing its initial concern that "all the gunshot wounds to Mr. Leong's body entered through the back," the Board ultimately satisfied itself, through a visit to the scene of the incident and a re-enactment of the shooting, that this fact was explained by the angle from which Officer Pratt was firing, to the right of the patrol car's front passenger door, as Mr. Leong stood with his left shoulder pointed toward Officer Borgens. (*Id.* at 6.) The Board reasoned that most or all of Mr. Leong's gunshot wounds resulted from bullets fired by Officer Pratt, while most of the bullets fired by Officer Borgens missed Mr. Leong in light of the "evasive action" the officer was taking as he fired. (*Id.*) Thus, the Board concluded that the officers acted in accordance with departmental guidelines, and that they shot Mr. Leong in self defense after he had first fired his shotgun into the roof of his truck, and then exited the vehicle and pointed his weapon toward the officers. (*Id.* at 7–8.)

### III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

Through their present motion, Defendants seek an award of summary judgment in their favor on all of the claims asserted in Plaintiff's Complaint. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judg-

ment.[3]   According to the *Celotex* Court:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motion.

### B. Defendants Borgens and Pratt Are Entitled to Qualified Immunity for Their Reasonable Use of Deadly Force Against Mr. Leong.

Plaintiff's federal constitutional claims against Defendants Borgens and Pratt rest upon the allegation that these officers unlawfully employed deadly force in their confrontation with Mr. Leong. The seminal case on a police officer's use of deadly force is *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In that case, the Supreme Court held that the Fourth Amendment standard of "reasonableness" governs the determination whether a police officer may use deadly force in seizing a suspect. The Court then explicated the contours of this standard:

Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of seri-

---

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful tri-

als." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

ous physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11–12, 105 S.Ct. at 1701.

More recently, in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court provided further guidance to courts applying the Fourth Amendment "reasonableness" standard in cases involving allegations of excessive force. The Court explained that the proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. at 1872. The Court emphasized that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the ²⁰⁄₂₀ vision of hindsight," and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 396–97, 109 S.Ct. at 1872.

■ Returning to the present case, Defendants Borgens and Pratt argue that the doctrine of qualified immunity shields them from liability for any alleged violation of Mr. Leong's federal constitutional rights. Governmental officials are entitled to qualified immunity from liability in a § 1983 action where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mercure v. Van Buren Township*, 81 F.Supp.2d 814, 829 (E.D.Mich.2000) (internal quotations and citations omitted). More specifically, in cases involving the use of deadly force, "[t]he central legal question is whether a reasonably well-trained officer in the defendant's position would have known that shooting the victim was unreasonable in the circumstances." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir.1998).[4]

If the testimony of Defendants Borgens and Pratt were fully credited here, there could be no doubt that these officers would be entitled to qualified immunity for their decision to use deadly force against Mr.

---

4. The courts have observed that, in cases involving deadly or allegedly excessive force, the qualified immunity and underlying Fourth Amendment "reasonableness" inquiries are closely related, as both turn on considerations of objective reasonableness. *See, e.g., Napier v. Town of Windham*, 187 F.3d 177, 182–83 (1st Cir.1999) (noting that, in excessive force cases, "the 'objective reasonableness' of the officers' conduct is crucial to both the qualified immunity and substantive [Fourth Amendment] liability inquiries"); *Wilson v. Meeks*, 52 F.3d 1547, 1552–53 (10th Cir. 1995). In a recent ruling, however, the Supreme Court cautioned that these two inquiries must remain distinct, in order to achieve the goal of qualified immunity to ensure that unsubstantial claims generally are identified and winnowed out at the earliest possible stage in litigation. *See Saucier v. Katz*, 531 U.S. 991, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Saucier* mandates a two-step process for resolving claims of qualified immunity. First, a court must ask whether the facts and allegations, viewed most favorably to the party asserting the injury, demonstrate that the defendant officer's conduct violated a constitutional right. 121 S.Ct. at 2155–56. If so, the court then must ask whether this right was clearly established, and the "relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 2156. As discussed below, the Court answers the first question in the negative in this case, and thus does not reach the second prong of the inquiry.

Leong. According to their version of the incident, which is consistently recounted by both officers, Mr. Leong led the police on a chase down several streets and alleys, eventually arriving at a dead end where his pickup truck was blocked by the officers' vehicle. Mr. Leong then discharged his shotgun as he exited his truck, racked the weapon, began moving toward Officer Borgens' position on the driver's side of the scout car, and then leveled his gun at first one and then the other officer. He failed to heed the officers' repeated warnings that he put down his weapon, and instead continued to move toward Officer Borgens while inviting the officers to shoot him. Given the clear and present threat Mr. Leong posed to the officers, and the substantial risk of serious physical harm or even death if he had been permitted to continue moving toward the officers with his shotgun trained on them, it would be reasonable for a well-trained officer in this situation to use deadly force, and Plaintiff does not contend otherwise.

Yet, Plaintiff argues that "summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." *Sova,* 142 F.3d at 903.[5] In this case, there are no other eyewitness accounts from which Plaintiff could cull a different version of the events leading up to the fatal shooting. Nevertheless, based on the back-to-front nature of the gunshot wounds suffered by Mr. Leong, as well as the alleged "criss-cross pattern" of the bullets that struck the victim, Plaintiff has offered the statement of a forensic pathology expert, Dr. Sanford Edberg, that Mr. Leong was turned away from both police

officers when he was shot. (Plaintiff's Response, Ex. 2.) Plaintiff then cites *Sova* and two Ninth Circuit cases, *Harris v. Roderick,* 126 F.3d 1189, 1201–03 (9th Cir. 1997), and *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991), for the proposition that deadly force is not necessarily warranted in all cases involving armed suspects, if no imminent threat is posed by virtue of the positioning of the suspect and his weapon.

Under the particular circumstances presented here, this Court does not share Plaintiff's view as to the significance of the question whether Mr. Leong was facing the officers or had turned away at the moment he was shot. Initially, the Court notes that none of the cases cited by Plaintiff establishes such a bright-line rule. In *Sova,* the District Court apparently had credited the defendant police officers' deposition testimony that the victim had threatened to get a gun, and then had charged at the officers with two butcher knives. *See Sova,* 142 F.3d at 900, 902. The Sixth Circuit noted, however, that other eyewitnesses disputed this account, denying that the victim had said anything about a gun, and stating that the victim was standing in a doorway, and not charging at the defendant officers, when he was shot and killed. 142 F.3d at 902. The Court then held that the court below had improperly resolved these disputed factual issues in the context of a motion for summary judgment, and that, if the plaintiffs' version of the incident were believed, a jury could conclude that the defendant officers' use of deadly force was not justified by "a reasonable belief that [the suspect]

---

**5.** In light of the Supreme Court's decision in *Saucier,* this is not strictly true in all cases. Even if it were concluded, upon resolving all such factual disputes in the plaintiff's favor, that an officer's use of deadly force was unreasonable under the Fourth Amendment, the

officer still would be entitled to qualified immunity if, under the present state of the law, a reasonable officer could have concluded—albeit mistakenly—that deadly force was authorized under the circumstances. *See Saucier,* 121 S.Ct. at 2158.

posed a significant threat of death or serious physical injury to the officer or others." 142 F.3d at 903.

Similarly, both *Curnow* and *Harris* featured allegations or evidence that a suspect, while perhaps armed or with a weapon nearby, had not taken any action to threaten the safety of the defendant law enforcement officers or others. In *Curnow*, the defendant police officers' appeal to qualified immunity rested on their statements that the victim had reached for and raised his weapon—in that case, an HK–91 semi-automatic rifle—before the officers fired in their own defense. *Curnow*, 952 F.2d at 323. The Ninth Circuit held that the defendants were not entitled as a matter of law to qualified immunity, in light of the statement of an eyewitness that the victim had not reached for his gun before he was shot, and that the officers' first shot had struck him in the back. 952 F.2d at 325. Accepting this version as true, the Court found that "the police officers could not reasonably have believed the use of deadly force was lawful because [the victim] did not point the gun at the officers and apparently was not facing them when they shot him the first time." 952 F.2d at 325.

*Harris* also involved allegations that a victim, though armed, had made no threatening movements toward the defendant law enforcement officials or others. That case arose from the well known "Ruby Ridge" incident, and the plaintiff alleged that the federal law enforcement officials on the scene had adopted "Special Rules of Engagement" for the occasion, under which they "could and should" use deadly force against "any armed adult male" in the area. *Harris*, 126 F.3d at 1193, 1202. The Ninth Circuit held that these "Special Rules," if followed, would constitute a "gross deviation from constitutional principles," as they neither called for a warning nor required that the suspect pose an immediate threat to the officer or others. 126 F.3d at 1202. Moreover, independent of these "Special Rules," the Court found that plaintiff Kevin Harris' allegations in his complaint regarding his shooting by FBI agent Lon Horiuchi defeated the agent's appeal to qualified immunity, where, "[e]ven though Harris was armed, he made no aggressive move of any kind when Horiuchi started shooting," but instead was merely running back to the cabin from which he had recently emerged, and where "Horiuchi and his fellow officers were safely ensconced on the hill overlooking the Weaver cabin" at the time of the shooting. 126 F.3d at 1203.

These cases, then, merely affirm the principle that a police officer's use of deadly force must rest upon "a reasonable belief that [the suspect] posed a significant threat of death or serious physical injury to the officer or others." *Sova*, 142 F.3d at 903. None of these decisions establishes the further proposition that a suspect, though armed, poses no such threat so long as he is facing away from the officer. To be sure, *Curnow* includes language that arguably supports this position, noting that the victim in that case "did not point the gun at the officers and apparently was not facing them when they shot him." *Curnow*, 952 F.2d at 325. Yet, under the version of the facts offered by the plaintiffs in that case, the victim had not even reached for his gun before the police began shooting. Thus, the Court does not construe *Curnow* as turning upon the direction in which the suspect was facing or pointing his weapon.

Indeed, any bright-line rule which depended solely upon such facts would run afoul of the Supreme Court's express recognition that police officers frequently must make "split-second judgments" under "circumstances that are tense, uncertain,

and rapidly evolving." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872. Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or by-stander in an instant, with disastrous consequences. This Court is aware of no case, and Plaintiff has not cited one, which would compel a police officer to await such an occurrence, despite otherwise having determined that a suspect is armed and poses an imminent threat of serious harm to the officers or others in the vicinity.

The dubious nature of any such proposed rule is best illustrated through cases holding that deadly force may reasonably be employed even against an unarmed suspect, where the suspect has taken some action to raise a threat of imminent danger. In *Reese v. Anderson*, 926 F.2d 494 (5th Cir.1991), for instance, the Fifth Circuit held that the defendant police officer, Steve Anderson, was entitled to qualified immunity, where officers surrounded the suspects' car and ordered the occupants to keep their hands up, but where one of the occupants, Richard Crawford, was shot and killed when he twice disregarded the officers' instructions and reached his hands down below Officer Anderson's line of sight. The Court explained:

> Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby. He could reasonably believe that Crawford had retrieved a gun and was about to shoot. That is, an officer would have probable cause to believe that "the suspect pose[d] a threat of serious physical harm." *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701. Anderson had repeatedly warned Crawford to raise his hands and was now faced with a situation in which another warning could (it appeared at the time) cost the life of Anderson or another officer. Under such circumstances, an officer is justified in using deadly force to defend himself and others around him . . . .

> The fact that the vehicle was "totally surrounded" by police does not change matters; had Crawford in fact retrieved a gun from beneath his seat, he could have caused injury or death despite the presence of numerous police officers. Also irrelevant is the fact that Crawford was actually unarmed. Anderson did not and could not have known this. The sad truth is that Crawford's actions alone could cause a reasonable officer to fear imminent and serious physical harm.

*Reese*, 926 F.2d at 501 (footnote omitted).

Similarly, in its recent decision in *Anderson v. Russell*, 247 F.3d 125 (4th Cir.2001), the Fourth Circuit addressed a case in which the defendant police officer, David Russell, was patrolling a shopping mall when he was approached by a patron and informed that another patron, plaintiff Major Maurice Anderson, apparently was carrying a gun under his sweater. The officer observed Anderson for a few minutes, and then confronted him as he left the mall, approaching Anderson with his gun drawn and ordering him to raise his hands and get down on his knees. Anderson initially complied, but then lowered his hands without explanation. Believing that the suspect was reaching for the reported weapon, defendant Russell shot Anderson three times, seriously and permanently injuring him. Subsequent investigation revealed that Anderson was unarmed, and that Anderson apparently was reaching down to turn off a Walkman radio in his back pocket when Russell shot him. An eyewitness to the incident testified that Anderson was lowering his hands slowly, and that his hands remained at around the level of his head when he was shot.

Under these facts, the Fourth Circuit held that Officer Russell was entitled to judgment as a matter of law on Anderson's claim of excessive force:

> The evidence establishes that immediately before Russell fired, Anderson was reaching toward what Russell believed to be a gun. Any reasonable officer in Russell's position would have imminently feared for his safety and the safety of others. This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action. We have further held that an officer is not required to see an object in the suspect's hand before using deadly force. Accordingly, because Russell had sound reason to believe that Anderson was armed, Russell acted reasonably by firing on Anderson as a protective measure before directly observing a deadly weapon.

*Anderson*, 247 F.3d at 131 (citations omitted).

Even more to the point, in *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir.1995), the Tenth Circuit considered a case where, as here, there was a factual dispute as to whether a shooting victim, Datton Wilson, had pointed his gun at the defendant police officer, Luther Meeks. Officer Meeks followed Wilson's truck to his home to investigate a reported altercation between Wilson and another motorist. Upon arriving at his home, Wilson went inside, retrieved an unloaded .357 magnum revolver, and stood by his porch with his gun concealed behind his leg. Concerned that Wilson might be hiding a weapon, Meeks demanded, "I want to see that hand." When Wilson failed to comply, Officer Meeks repeated his demand and drew his own weapon. According to Meeks, Wilson then aimed his gun at the officer. The plaintiffs, however, claimed that Wilson held the gun out in a "surrender position." In any event, Meeks responded by shooting Wilson twice, and he later died of these wounds.

Despite this factual dispute as to whether Wilson had pointed his gun at Officer Meeks, and despite the conclusions of the plaintiffs' experts that the forensic evidence supported the plaintiffs' version of the incident, the Tenth Circuit held that the officer was entitled to qualified immunity:

> Mr. Wilson's hand, by all accounts, was not pointed far enough to the right to dispute Officer Meeks' contention [that] he reasonably feared for his life. Indeed, it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life—if not his own, then the life of a bystander or the gunman himself.

> Plaintiffs have erroneously cast this factual dispute as an inquiry into whether Mr. Wilson was surrendering. They point out that he had backed up as Officer Meeks directed, and that he was "quivering" and not holding his gun horizontal and perpendicular to the ground. Perhaps Mr. Wilson intended to surrender. If so, his death is particularly tragic. However, the inquiry here is not into Mr. Wilson's state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, Officer Meeks reasonably feared for his life. Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat. Officer Meeks did so.

*Wilson,* 52 F.3d at 1553–54.[6]

Consequently, having reviewed the relevant case law, and having found no support for a bright-line rule regarding the direction a suspect is facing or a weapon is pointed, the Court returns to the point where its inquiry began, with the "reasonableness" test set forth in *Garner*—namely, whether the Defendant officers in this case had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer[s] or to others." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. Considering the totality of the circumstances, as required in *Graham, supra,* and considering the evidence in a light most favorable to Plaintiff, the Court readily concludes that the actions of Defendants Borgens and Pratt satisfy this test.

The officers in this case were faced with a situation where (i) Mr. Leong had led them on a chase through several streets and alleys; (ii) upon cornering the suspect, he fired his shotgun into the roof of his truck and emerged from his vehicle with this weapon; and (iii) Mr. Leong disregarded repeated warnings that he put down his gun, and instead racked his gun and invited the officers to shoot him. Given all this, the Court finds it unnecessary to decide whether, as the Detroit Police Department's Board of Review concluded, the gunshot wounds to the back of Mr. Leong were consistent with the officers' statements that he was pointing his shotgun at Officer Borgens in a "bladed" stance, or whether, as Plaintiff's expert contends, the forensic evidence indicates that Mr. Leong had his back turned to both officers. In either case, Mr. Leong had exited his truck while wielding a shot-

gun, had demonstrated a predisposition to use it by first firing and then racking the weapon, and had disregarded the Defendant officers' instructions that he drop the weapon. Regardless of whether he actually pointed his gun at the officers, or instead remained with his back turned, he was quite capable of leveling this weapon at an officer or bystander and inflicting severe injury or death in an instant.

Under these circumstances, the Court finds as a matter of law that the Defendant officers reasonably employed deadly force to quell the threat posed by Mr. Leong. In this Court's view, the law does not require that a suspect pose a direct, imminent, and unmistakable threat of serious injury or death before an officer may use deadly force in defense of himself or others. To impose such a requirement would not only exceed the strictures of *Garner* and its progeny, but would, as often as not, constrain the officer to wait until it was too late to prevent severe injury or death to himself or innocent bystanders, thereby subverting the very purpose of the legitimate use of deadly force. Moreover, as noted, such a rule would contravene the Supreme Court's admonition in *Graham* that an officer's actions must be judged with a fair degree of latitude, in light of the split-second decisions an officer frequently must make under the stresses of the moment in situations posing a threat of death or injury.

Finally, Plaintiff seeks, in her response brief and particularly at oral argument, to raise additional issues of fact bearing on the veracity of the Defendant officers' account of Mr. Leong's actions and their responses. First, Plaintiff suggests that there might be some question as to wheth-

---

**6.** In an unpublished opinion, the Sixth Circuit cited both *Wilson* and *Reese* to refute the proposition that "it was necessary for [the shooting victim] to point his gun at [the de-

fendant officer] before it was reasonable for [the officer] to use deadly force against him." *Bell v. City of East Cleveland,* 1997 WL 640116, at \*4 n. 1 (6th Cir. Oct.14, 1997).

er Mr. Leong was, in fact, holding his shotgun at the time of the shooting. In particular, Plaintiff points to the statement of her expert, Dr. Sanford Edberg, that "[t]he gunshot wound to [Mr. Leong's] hand was from the palm as the entrance wound to the back of the hand as the exit wound with the hand facing backward and not holding the shotgun at this time, again supporting the supposition of Mr. Leong being turned away from the officers when shot." (Plaintiff's Response, Ex. 2.)

As an initial matter, the Court notes that this statement is rather vague and ambiguous. In particular, it is not clear whether Dr. Edberg is relying on the wound to Mr. Leong's hand merely to corroborate the "supposition" that Mr. Leong was facing away from the officers,[7] or whether Dr. Edberg means to propound the additional theory that Mr. Leong was not carrying his shotgun at the time he suffered the gunshot wound to his hand. As is clear from the above discussion, only the latter reading of Dr. Edberg's statement could possibly raise a material issue of fact.

Moreover, even under this reading, the Court finds that Dr. Edberg's statement does not overcome the reasonableness of the Defendant officers' conduct. Significantly, all of the physical evidence at the scene of the shooting corroborates the officers' testimony that, at a minimum, Mr. Leong fired his shotgun, emerged from his truck with this weapon, and then racked it, ejecting a spent shotgun shell and replacing it with a live shell. Specifically, the record includes evidence of a hole in the roof of Mr. Leong's truck caused by a shotgun blast, a spent shotgun shell near

his body, and the shotgun itself lying outside the pickup truck, a few feet away from Mr. Leong's body. Thus, the record uniformly indicates that Mr. Leong fired his shotgun as he emerged from his truck, and that he carried this weapon as he left the vehicle.

At best, then, Dr. Edberg's statement might permit the inference that Mr. Leong dropped his shotgun at some point during the shooting, before he sustained the gunshot wound to his hand. To go beyond this, and to permit a jury to decide whether Mr. Leong might have dropped his weapon even before the officers began shooting, would be to engage in pure speculation, untethered to any supporting evidence in the record. *See Boyd v. Baeppler,* 215 F.3d 594, 603–04 (6th Cir.2000) (finding, in a § 1983 deadly force case, that the report of the plaintiff's expert failed to raise a genuine issue of material fact, where it was based on "mere probabilities" and assumptions and was contradicted by the coroner's report). This is particularly so where Dr. Edberg's statement, apart from its ambiguity, is wholly conclusory, and is not accompanied by any explanation or supporting reasoning as to why the wound in Mr. Leong's hand might lead to the conclusion that he was not holding his shotgun at the time. Accordingly, the Court finds that this aspect of Dr. Edberg's report fails to undermine the conclusion that the Defendant officers acted reasonably as a matter of law.

Next, Plaintiff points to the location of certain spent shell casings and to evidence of strike marks on an adjacent school wall as purportedly casting doubt upon the De-

---

**7.** In this regard, it should be noted that another of Plaintiff's experts, David Balash, has expressed his disagreement with Dr. Edberg's view that the bullet that struck Mr. Leong's hand entered through his palm and exited out the back of his hand. According to Balash, a forensics expert, "it appears to me to be more an entrance in the knuckle area and the exit in the palm," and "[t]he palm is not consistent, in my opinion, with an entrance wound." (Balash Dep. at 171.)

fendant officers' testimony regarding their positions as they fired at Mr. Leong. Plaintiff then cites the opinion of her forensics expert, David Balash, that this physical evidence is inconsistent with the version of the shooting offered by the Defendant officers.[8] According to Balash's report, there was "abundant firearms evidence at the scene that did not support the version of events offered by the involved officers," and, based on this evidence, he concluded that "[t]he officers were not in the positions claimed during the shooting, but moved toward the middle of the street." (Balash Report at 2–3.)

Again, the Court finds that this expert opinion, like the one offered by Dr. Edberg, cannot bear the weight that Plaintiff seeks to place upon it. Initially, the Court notes that Balash qualified his opinion in a number of important respects at his deposition. First, regarding the strike marks on the wall of the school adjacent to the scene of the shooting, Balash testified that he discovered two such marks upon visiting the scene on November 30, 2000 (the day of his deposition), over *three years* after the date of the shooting. Plainly, after the passage of this much time, it would be difficult to establish a link between the incident at issue here and any physical evidence which might be found at the scene. Balash acknowledged as much, and further conceded that he could say

only that the marks in question "[c]ould have been bullet strikes." (Balash Dep. at 138.) Moreover, contrary to the statements of Plaintiff's counsel at the April 19 hearing, Balash offered no opinion as to whether these possible strike marks were or were not consistent with the Defendant officers' testimony that they fired at Mr. Leong from positions behind or adjacent to the doors of their squad car.[9]

Next, regarding the locations of spent shell casings as recorded by police investigators shortly after the shooting, Balash conceded, as an initial matter, that it is not necessarily safe to assume that these casings were discovered at their initial positions, and had not been displaced by vehicle tires or through inadvertent kicking by investigators at the scene. (*Id.* at 49, 52–53, 64.) Further, Balash readily acknowledged the difficulty of determining the precise positions of the Defendant officers by resort only to the locations of the shell casings expelled from their weapons; in particular, he characterized the ejection pattern of the officers' weapons as "random" and "not consistent[ ]." (*Id.* at 33, 62.) In any event, Balash opined that many, though not all, of the shell casings were found at locations consistent with the officers' testimony that they fired at Mr. Leong from positions behind or adjacent to

---

**8.** Notably, Plaintiff failed to mention Balash's report or deposition testimony in her written response to Defendant's motion, and did not submit these materials as part of the record in opposition to the motion. Instead, her counsel cited Balash's expert opinion for the first time at oral argument on Defendant's motion, and then provided copies of the report and deposition transcript at the Court's request following the April 19 hearing.

**9.** From this Court's admittedly non-expert review of a sketch of the scene prepared by a police investigator shortly after the shooting, it would appear quite possible that a shot

fired from the driver's side door of the squad car in the general direction of Mr. Leong's truck could have struck the north wall of the school and produced the mark later discovered by Plaintiff's expert. Such a strike mark could, as well, have been caused by a bullet deflecting off another object and being redirected into the wall. Balash acknowledged at his deposition that such deflections can occur. (*See, e.g., id.* at 50–51, 71, 125.) At a minimum, no evidence or expert opinion in the record forecloses these possibilities, and they are at least as plausible as any inculpatory reading of the evidence.

the doors of their squad car. (*See id.* at 57, 59–60, 65–66, 71.)

At most, then, Balash's report and deposition testimony raise a question as to whether the Defendant officers remained at all times in positions adjacent to their vehicle as they fired at Mr. Leong, or whether they moved to different positions during the course of the shooting.[10] Even so, this does not aid Plaintiff in her effort to identify an unreasonable use of deadly force. Surely, if the officers were justified in their initial employment of deadly force, by virtue of the threatening nature of Mr. Leong's actions as he exited his truck, any change in their positions as they responded to the threat posed by Mr. Leong would not undermine the reasonableness of their determination that deadly force was appropriate. The Court is not aware of any authority for the proposition that the precise manner of employment of deadly force has any bearing on the antecedent question whether the use of such force was constitutionally proper in the first instance.

Rather, the key question remains whether, in light of Mr. Leong's conduct, a reasonably well-trained officer in Defendants' position would have perceived a threat of serious physical harm to either himself or others. As to this dispositive issue, Balash testified (i) that "if I were the police and they were pointing a shotgun at me, I would shoot them, too," (*id.* at 151); (ii) that he had not formed an opinion as to whether Mr. Leong was, in fact, aiming his shotgun at the officers at the time they fired their weapons, (*id.* at 181); and (iii) that the evidence he had reviewed did not permit him to draw any conclusions on this

latter point, (*id.*). Plainly, this testimony fails to shed any light on the threat posed by Mr. Leong, nor does it in any way undermine the record evidence, including the officers' testimony and the corroborating physical evidence, that Mr. Leong's actions did indeed present a genuine risk of serious injury or death sufficient to justify the use of deadly force. Consequently, the Court finds that the expert opinion of David Balash, like that of Dr. Edberg, does not raise an issue of material fact as to the reasonableness of the Defendant officers' use of deadly force.

## C. Plaintiff's Remaining Claims

Plaintiff's sole remaining federal claim is that the Defendant City of Detroit is liable for the infringement of Mr. Leong's constitutional rights by its police officers, in light of a municipal policy or custom that was the moving force behind this constitutional violation. However, the City cannot be liable where, as held earlier, there has been no violation of Mr. Leong's constitutional rights. *See Scott v. Clay County,* 205 F.3d 867, 879 (6th Cir.2000); *Monday v. Oullette,* 118 F.3d 1099, 1105 (6th Cir. 1997).

This leaves only Plaintiff's state constitutional claims and, arguably, one or more state-law tort claims—although neither the Complaint nor Plaintiff's response to Defendants' motion clearly indicates whether these latter theories of recovery are, in fact, being pursued. Having resolved Plaintiff's federal claims, the Court declines to retain jurisdiction over any remaining state-law claims, but leaves these

---

**10.** The Court observes that Plaintiff has adopted arguably inconsistent positions on this point. On one hand, her expert opines that the Defendant officers were moving as they fired at Mr. Leong. On the other hand, Plaintiff's experts posit that Mr. Leong had his back turned to the officers as they shot him. Seemingly, if the officers had moved any significant distance during the shooting, their bullets would have struck Mr. Leong from different angles, and not uniformly from the rear.

872

to be adjudicated on remand to the state court.[11]  *See* 28 U.S.C. § 1367(c)(3).

## IV.  *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' December 22, 2000 Motion for Summary Judgment is GRANTED

---

11.  The Court notes, however, that the Michigan Supreme Court's recent decision in *Jones v. Powell*, 462 Mich. 329, 612 N.W.2d 423 (2000), casts substantial doubt on the viability of Plaintiff's claims under the Michigan Constitution.