

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-14-2005

# Bennett v. Murphy

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1643

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bennett v. Murphy" (2005). *2005 Decisions.* Paper 1563.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1563

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-1643
_____

SALLY BENNETT, Administratrix of the Estate of David Bennett,

Appellant

v.

FRANCIS J. MURPHY, III, Individually and as a Pennsylvania State Police Officer of the
Commonwealth of Pennsylvania; MARK F. NOWAKOWSKI, Individually and in his capacity
as a corporal of the Pennsylvania State Police of the Commonwealth of Pennsylvania.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
D.C. Civ. No. 94-214
District Judge: The Honorable Arthur J. Schwab

_____

Submitted pursuant to Third Circuit LAR 34.1(a)
on December 6, 2004

BEFORE: AMBRO and VAN ANTWERPEN, Circuit Judges, and SHADUR,[*] District Judge

(Filed      January 14, 200      )

_____

OPINION OF THE COURT

_____

_____

*Honorable Milton I. Shadur, Senior United States District Judge for the Northern
District of Illinois, sitting by designation.

SHADUR, <u>District</u> <u>Judge</u>:

Sally Bennett ("Bennett") appeals the District Court's grant of summary judgment in favor of State Trooper Francis Murphy ("Murphy") on the ground of qualified immunity in Bennett's suit for damages following the fatal shooting of her son David Bennett ("David"). Because we conclude that the District Court erred in holding that the law regarding the use of deadly force was insufficiently clear as applied to the facts alleged by Bennett, we hold that Murphy is not entitled to qualified immunity. Accordingly we reverse the District Court's grant of summary judgment in Murphy's favor and remand the case for trial.

Background

Murphy shot David fatally following a prolonged armed standoff between David and police in a field near an apartment complex on January 4, 1994. Bennett brought suit in February 1994 under 42 U.S.C. §1983 ("Section 1983"), alleging the use of excessive force by a police officer in violation of the Fourth Amendment. Following a trial on the merits in September 1996, the jury returned a verdict in Murphy's favor. Bennett filed a motion for a new trial one year later on the ground that information in Murphy's personnel records relevant to his credibility had been withheld during discovery. After the District Court granted that motion, Murphy in turn moved for summary judgment on the ground of qualified immunity. Concluding in "<u>Bennett I</u>," 127 F.Supp.2d 689, 699 (W.D. Pa. 2000) that "Murphy is not entitled to qualified immunity on summary judgment because of disputes of fact and issues of credibility that should be submitted to a jury," the District Court denied that motion.

During the pendency of Murphy's ensuing appeal to this Court, the Supreme Court decided <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), which definitively prescribed the analysis to

be undertaken by courts facing claims of qualified immunity in excessive force cases. Engaging in Saucier's two-step analysis, we held in Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2001) ("Bennett II") that the facts taken in the light most favorable to Bennett indeed showed a constitutional violation. But we remanded the case for the District Court to engage in the second step of the Saucier inquiry: whether the law regarding the use of excessive force, as applied to the facts alleged by Bennett, was clearly established at the time of the incident (Bennett II, 274 F.3d at 136-37).

In the interim Judge Robert Cindrich, the District Court judge who had been presiding over the case, announced his retirement and the case was reassigned to Judge Arthur Schwab. In a memorandum opinion dated February 20, 2004 Judge Schwab concluded in "Bennett III," No. 94-214, mem. order at 7 that "under the factual scenario asserted by the plaintiff, a reasonable police officer would not have understood that his actions were prohibited, nor would it have been clear to a reasonable officer what the law required." Because he thus held that Murphy was entitled to qualified immunity, Judge Schwab granted his motion for summary judgment. Bennett appeals, and we have jurisdiction under 28 U.S.C. §1291.

Murphy's Lack of Entitlement to Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). After nearly two decades of further development of that doctrine, Saucier dictated a two-part inquiry to be used in determining whether an official is entitled to qualified immunity. At step one, the

3

question is whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right (533 U.S. at 201). If that question is answered in the affirmative, "the next, sequential step is to ask whether the right was clearly established" (id.).

Judge Cindrich's initial opinion in Bennett I, 127 F.Supp.2d at 690-91 (record citations omitted) summarized the facts alleged, viewed in the light most favorable to Bennett :

> The state police were called to the courtyard of a group of apartment buildings on the evening of January 4, 1994 to confront a man, David Bennett, who they soon learned was distraught at being unable to see his girlfriend. He was armed with a single shot shotgun that he held vertically in front of him, with the barrel pointed up at his head, and the stock facing down. He was "very deliberate in holding [the gun] toward himself or in the air," and did not point the gun at anyone, including state troopers. He said that he wanted to kill himself. As the troopers took up positions surrounding him in the open area between the apartment buildings, he became agitated and began moving toward a group of them, but stopped for perhaps four seconds before he was shot. Murphy was positioned 80 yards behind Bennett when he fired. Almost an hour passed between the time the state troopers first arrived on the scene, and the time Bennett was shot.

We adopted that version of the facts in Bennett II, and we do so again for purposes of the present qualified immunity inquiry.

In terms of the first step of the Saucier analysis, Graham v. Connor, 490 U.S. 386, 395 (1989) had earlier held that the use of force by police is subject to the Fourth Amendment and its "reasonableness standard." And Tennessee v. Garner, 471 U.S. 1, 11 (1985) had still earlier made it clear that the use of deadly force by an officer is constitutionally unreasonable and violates the Fourth Amendment unless a felony suspect poses an immediate threat of physical harm to police or others.

On that score we concluded in Bennett II, 274 F.3d at 136 that the facts alleged by

4

Bennett demonstrated that David did not pose a threat to anyone but himself, hence the use of

deadly force against him was objectively unreasonable.  Although we did not then quote the

summary of facts in Bennett I, 127 F.Supp.2d at 691 that compelled that conclusion, we find that

statement unexceptionable:

> Bennett admittedly was angry and defiant in the face of a group of determined, armed state troopers. But to take the version of the facts most favorable to Bennett, is it indisputably reasonable as a matter of law for a law enforcement officer 80 yards away; at night; under conditions of poor visibility; to shoot someone who is standing still; facing away; with a gun pointed at his own head, threatening suicide; surrounded by heavily armed fellow officers in close proximity; out of fear of a threat to other troopers positioned at one third the distance; who were in a much better position to see the decedent; and who did not shoot; after almost an hour had passed with no offensive action by the state police?

Because we not only agreed with the District Court's "no" answer to that question but

affirmatively concluded that a constitutional violation had occurred under Bennett's version of

the facts, we remanded for the District Court to consider whether David's Fourth Amendment

right was clearly established, explaining the inquiry as follows (Bennett II, 274 F.3d at 136-37

(emphasis in the original)):

> [I]n the factual scenario established by the plaintiff, would a reasonable officer have understood that his actions were prohibited?  The focus in this step is solely upon the law.  If it would not have been clear to a reasonable officer *what the law required* under the facts alleged, he is entitled to qualified immunity.  If the requirements of the law would have been clear, the officer must stand trial.

As stated earlier, the District Court then concluded that the law with respect to excessive

force was not clearly established as applied to Bennett's factual scenario.  Its holding relied on

two cases: Montoute v. Carr, 114 F.3d 181, 185 (11th Cir. 1997), and Leong v. City of Detroit,

151 F. Supp.2d 858 (E.D. Mich. 2001).  Both of those cases involved armed suspects as to

5

whom, although they never pointed their weapons at police, the courts concluded that the police reasonably believed the suspects presented an immediate threat and that the use of deadly force was therefore justified. In light of those cases, the District Court accepted Murphy's argument that even though <u>Graham</u> and <u>Garner</u> clearly established the "immediate threat" standard, that standard was not clear as applied to David, who was armed and refused commands to drop his weapon. On appeal Bennett argues that the law of excessive force was not as murky as Murphy would have it and that the cases relied upon by the District Court, because they involved dramatically different factual scenarios, do not support its conclusion that Murphy reasonably believed the law entitled him to shoot David.

At the outset we recognize that there is a degree of "duplication inherent in [<u>Saucier</u>'s] two-part scheme" as applied to excessive force cases (<u>Saucier</u>, 533 U.S. at 213 (Ginsburg, J., concurring in the judgment). That is, the question whether the amount of force an officer used was unreasonable and violated the Fourth Amendment may be viewed as blending somewhat into the question whether the officer reasonably believed that the amount of force he used was lawful. But <u>Saucier</u> makes clear that the two inquiries are distinct: Even where an officer's actions are unreasonable under <u>Graham</u>'s constitutional standard (as <u>Bennett II</u> held was true of Murphy's conduct), that officer is still entitled to immunity if he or she has a reasonable "mistaken understanding as to whether a particular amount of force is legal" in a given factual situation (<u>Saucier</u>, 533 U.S. at 205). Murphy thus asserts that even assuming his actions were constitutionally unreasonable, he made a reasonable mistake as to the legality of those actions. To support that assertion he puts forth two related arguments.

First, he contends that <u>Garner</u>'s "immediate threat" standard, while clearly established,

6

offered no guidance in the particular situation he faced. In that respect we are of course mindful of the principle, which the Supreme Court recently reaffirmed in Brosseau v. Haugen, 125 S.Ct. 596, 599 (2004)(per curiam)(quoting Saucier, 533 U.S. at 201), that the inquiry whether an injured party's constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Applying that principle, Brosseau, id. at 599-600 stated that Graham and Garner "are cast at a high level of generality" and provided little guidance as applied to the situation confronting the officer in that case: "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight."

We agree of course that Graham and Garner set out a standard that is general in nature in the context addressed in Brosseau. And we also agree with the District Court that there are circumstances, such as those in Brosseau, in which the "immediate threat" standard may be "subject to differing interpretations in practice" (Bennett III, mem. order at 7). But we cannot say that the Graham and Garner "immediate threat" standard is lacking in adequate substantive content as applied to the very different situation that Murphy addressed in Bennett's factual scenario: whether to shoot an armed distraught man who, although refusing to drop his weapon over the course of an hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and who was not in flight at the time he was shot.[1] As United States v. Lanier, 520 U.S.

_____

[1] Before David was shot, officers far closer than Murphy (who was fully 80 yards away and did not have full vision of the entire scene) had ordered him to halt (he had begun to move toward them, with the snow at the scene posing some difficulty in that regard). Witnesses whose testimony must be credited for present purposes swore that David had not only obeyed that "halt" order for a full four seconds when Murphy nevertheless chose to shoot him, but one of those witnesses said that David had actually taken a step backwards. And the duration of a time measured in seconds is seldom appreciated until one recites "one thousand and one, one thousand

7

259, 271 (1997) teaches, "general statements of the law are not inherently incapable of giving fair and clear warning" to public servants that their conduct is unlawful. And because (as we held in Bennett II) the facts alleged by Bennett disclose no basis from which to conclude that David posed an immediate threat to anyone but himself, we conclude that this case is one in which the "general constitutional rule already identified in decisional law...appl[ies] with obvious clarity to the specific conduct in question" (id).

Murphy's second and related argument is that in light of what he terms "similar" cases involving deadly force, his mistaken application of the "immediate threat" standard was reasonable. Murphy cites two of those cases, Montoute and Leong, in support of the proposition that he reasonably believed David could lawfully be shot because he had a weapon and refused to put it down. But in reality neither of those cases calls into question the rule, recognized as clearly established prior to this incident by the Ninth Circuit in Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997), that under Graham and Garner "[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."[2]

As to Montoute, Murphy seizes on the court's statement (114 F.3d at 185) that "[a]t least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."

---

and two" and so on in a measured cadence to mark that passage of time.

[2] Although the District Court refused to consider Harris because it was decided in 1997, three years after this incident, that refusal was misguided--for Harris had analyzed the state of the law as it existed at the time of the infamous Ruby Ridge incident in 1992. While it is therefore true that Murphy cannot be charged with knowledge of the decision itself, Harris is nonetheless relevant to our own analysis of the state of the law in 1994 as to the use of deadly force by police.

But the portion of the opinion immediately following that language (id.) demonstrates that the court's holding that the suspect posed an immediate threat did not rest upon the suspect's mere possession of a weapon, but rather on the use the suspect had made of his weapon:

> Sergeant Carr faced a situation fraught with danger. Montoute had fired an illegal weapon while in a crowd of people in a near-riot situation. He was armed with a 12-gauge, pistol-grip, sawed-off, pump shotgun. Such weapons are specifically designed or altered, and frequently used, by criminals to kill people....Any officer would know that, and would know that pump shotguns can carry and fire more than one round....Montoute's unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided an additional basis for inferring that he presented a risk of serious physical injury to an officer or someone else.

We simply cannot accept Murphy's position that Montoute shows him to have been reasonably mistaken about the legality of his actions in a factual matrix worlds away from the one confronting the officer in that case.

That applies as well to Leong, where "[t]he officers in this case were faced with a situation where (i) Mr. Leong had led them on a chase through several streets and alleys; (ii) upon cornering the suspect, he fired his shotgun into the roof of his truck and emerged from his vehicle with this weapon; and (iii) Mr. Leong disregarded repeated warnings that he put down his gun, and instead racked his gun and invited the officers to shoot him" (151 F. Supp.2d at 868). It was in that factual context that the court said (id. at 866):

> Plainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences.

So Leong and its sharply different factual situation likewise offer no support for Murphy's contention that he made a reasonable mistake as to the legality of his action in killing David.

Murphy cites a number of other cases in his brief in attempted support of his contention that he could not reasonably understand what the law required in the circumstances he faced. To

9

the contrary, the contrast between the situations confronting the officers in those cases--cases such as Rhodes v. McDannel, 945 F.2d 117, 118, 120 (6th Cir. 1991)(per curiam), Wilson v. Meeks, 52 F.3d 1547, 1549-50, 1552-54 (10th Cir. 1995) and Sigman v. Town of Chapel Hill, 161 F.3d 782, 784-85, 786-88 (4th Cir. 1998)--and the scenario in this case actually point in the opposite direction. On the facts as we must credit them, Murphy acted precipitately at a time and under circumstances totally lacking in the urgency posed by all of those cases: More than an hour had passed during the standoff with David, a period throughout which he had threatened to harm no one but himself; and when Murphy chose that instant to shoot to kill, David was at a standstill 20 to 25 yards from the nearest officer and fully 80 yards from Murphy himself.

Surely Murphy cannot rely on such cases, all of them involving suspects who unquestionably posed an immediate threat of physical harm to police, in support of the contention that he reasonably believed it was lawful to shoot David, who posed no such threat. To be sure, those other cases may illustrate that the concept of excessive force "is one in which the result depends very much on the facts of each case" (Brosseau, 125 S.Ct. at 600). But as we have already explained, the facts alleged by Bennett, which we take as true for purposes of the qualified immunity inquiry, are such that any reasonable officer would understand, without reference to any other case law, that Graham and Garner prohibited shooting David. For that reason we conclude that Murphy is not entitled to qualified immunity.

## Conclusion

We have determined on the record before us that Murphy is not entitled to qualified immunity. That of course is not the end of the matter--we reiterate our statement in Bennett II, 274 F.3d at 137 that nothing precludes Murphy "from arguing that he reasonably perceived the

10

facts to be different from those alleged by the plaintiff. An officer may still contend that he reasonably, but mistakenly, believed that his use of force was justified by the circumstances as he perceived them; this contention, however, must be considered at trial." We thus reverse the District Court's grant of summary judgment in Murphy's favor and remand the case for a full consideration of Bennett's claims at trial.